**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

NANCY HUGHES,                              )
      Plaintiff,                        )
                                        )
      v.                                )    CAUSE NO.: 4:05-CV-23-PRC
                                        )
JO ANNE B. BARNHART,                       )
Commissioner of the Social Security        )
Administration,                            )
      Defendant.                        )

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Nancy Hughes,

on March 24, 2005, and a Motion for Summary Judgment [DE 11], filed by Ms. Hughes on July 20,

2005. Ms. Hughes seeks judicial review of a final decision of the Defendant, the Commissioner of

the Social Security Administration ("Commissioner"), in which Ms. Hughes was denied Disability

Insurance Benefits under Title II of the Social Security Act. For the following reasons, the Court

grants Ms. Hughes' request to reverse and remand the decision of the Commissioner.

**PROCEDURAL BACKGROUND**

On June 27, 2002, Ms. Hughes filed an application for a period of disability and disability

insurance benefits alleging disability as of March 1, 2001. The application was denied initially and

upon reconsideration. Ms. Hughes then filed a timely request for a hearing before an Administrative

Law Judge ("ALJ"), and the hearing before ALJ Bryan Bernstein was conducted on July 13, 2002.

On December 3, 2004, the ALJ issued an unfavorable decision, finding that Ms. Hughes was not

disabled because she retained the residual functional capacity ("RFC") to perform a modified range

of light work[1] and remained capable of performing some of her past relevant work as well as a

significant number of jobs in the economy.  The ALJ considered Ms. Hughes' age, education, past

work experience, RFC, and the testimony of the VE, in making the following findings:

(1)     The claimant meets the earnings related eligibility requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability, March 1, 2001.

(3)     The claimant has severe impairments based on the requirements in the Regulations 20 CFR § 404.1520(c).

(4)     The medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding her limitations are not reliable.

(6)     The claimant retains the residual functional capacity to perform work at the light level of exertion.

(7)     The claimant's past relevant work as a clerical, accounting payroll clerk, and computer worker does not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

(8)     The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

(9)     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(f)).

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

(10)    Alcohol abuse is not a "material" finding in the determination of disability, inasmuch as the claimant is not disabled.

R. at 28-29.

Ms. Hughes filed a Request for Review with the Appeals Council, which denied reversal or remand on January 28, 2005. Therefore, the ALJ's decision of December 3, 2004, is the final decision of the Commissioner.

A Complaint for Judicial Review was timely filed by Ms. Hughes with this Court on March 24, 2005. On July 20, 2005, Ms. Hughes filed a Motion for Summary Judgment and a Memorandum in Support. On September 6, 2005, the Commissioner filed a Defendant's Memorandum in Support of Commissioner's Decision. Ms. Hughes then filed a Plaintiff's Reply to the Commissioner's Memorandum in Support of Her Decision on September 14, 2005.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A.  Background Information

Ms. Hughes was 50 years old at the time of the ALJ's decision. Ms. Hughes has a high school education and her past relevant work included work as a general clerical worker, receptionist, inventory clerk, telephone sales clerk, and billing payroll clerk.

**B. Medical Evidence**

*1. Physical Medical Evidence*

Treatment notes from Demotte Physicians, Inc. on April 2, 2001, show Ms. Hughes complaining of muscle spasms and pain from the waist up, lasting three days. The attending physician prescribed pain medication and muscle relaxers. On April 20, 2001, Ms. Hughes returned, complaining that she could not breath well and still had back pain. On May 4, 2001, Ms. Hughes again visited Demotte Physicians, Inc. with complaints of sharp pain in her right rib cage area and of difficulty breathing, and the physician prescribed Darvocet. With a diagnosis of pleurisy, right side, from Dr. R. Kingma at the Demotte Clinic, a May 2001 bone scan and thoracic spine x-ray were conducted and revealed evidence of a recent level T7 compression fracture.

In June 2001, Ms. Hughes reported that her back was not improving, and the physician at Demotte Physicians, Inc. questioned whether it might be due to osteoporosis or the compression fracture.

On September 20, 2001, Dr. Hytham Rifai wrote to Dr. Kingma, reporting on his examination of Ms. Hughes for back pain on Dr. Kingma's recommendation. Dr. Rifai stated that Ms. Hughes complained of severe mid dorsal spine pain and acknowledged a previous diagnosis of osteoporosis and the x-ray that revealed the T7 compression fracture. Upon examination, palpation of the dorsal spine was very painful. Dr. Rifai advised Ms. Hughes to get an MRI of the thoracic spine. However, she expressed that she would prefer to go to Indiana University for further treatment because of lack of insurance, and Dr. Rifai gave her the name of a neurosurgeon at the University. Dr. Rifai suggested that she may benefit from vertebroplasty.

4

On March 21, 2002, Ms. Hughes saw Dr. Kingma with complaints of back pain, and Dr. Kingma diagnosed osteoporosis and compression fracture and prescribed medication.

On October 3, 2002, Surenda Shah, M.D., evaluated Ms. Hughes for disability due to a compression fracture at T7. Ms. Hughes stated that she was in a lot of pain in her mid and upper back and was unable to sit in a chair or in an upright position for more than ten minutes. She reported being unable to drive a car for more than ten minutes, but could ride in a car if someone else was driving. She told the physician that she could not perform household chores and had pain with bending, squatting, pushing, and pulling. She stated that any position except lying down was painful. On examination, Dr. Shah described Ms. Hughes as having no acute distress. She was able to walk without using a cane and her gait was normal. She said she could not walk on her heels, but she did perform tandem walking and she was able to squat down with the help of a chair. Ms. Hughes had thoracic spine tenderness and she had some decreased ranges of motion. She had normal muscle strength in all extremities and there were no signs of muscle atrophy. She also had normal grip strength and there were no limitations in fine manipulations. Dr. Shah's impressions were chronic mid back pain secondary to probable compression fracture of the T6-7 vertebra and osteoporosis.

On January 2, 2003, a physician with Demotte Physicians, Inc. indicated an impression of chronic back pain. Ms. Hughes felt she had no improvement with the Zoloft. Ms. Hughes was prescribed medications and instructed to return in ten days. On January 14, 2003, Ms. Hughes returned and was again diagnosed with chronic back pain and osteoporosis. She was again prescribed medications and was instructed to return in two to three weeks.

On February 26, 2003, Ms. Hughes began chiropractic treatment with Boban Kecman, D.C. Ms. Hughes reported severe back pain in her neck, mid back, and lower back, which was aggravated by standing, sitting, walking, and other movement of the spine. Dr. Kecman noted the compression fracture of T7 due to severe osteoporosis. On February 27, 2003, Dr. Kecman x-rayed her thoracic spine and found hypertrophic change associated with the vertebral bodies in the mid-thoracic region of the spine. He found a moderate compression deformity/fracture at the T7 vertebra, which he noted was old in nature in accordance with her history. Dr. Kecman diagnosed spondylosis deformans of the mid-thoracic spine. He noted that the T1-T8 region was tender to the touch and that Ms. Hughes appeared to be depressed due to pain. Ms. Hughes returned to Dr. Kecman on numerous occasions.

In March 2003, Ms. Hughes was still having back pain and stated she was restricted in breathing, and Dr. Kecman noted tightness over the T6 region. Dr. Kecman noted she missed many visits because she felt terrible, had severe headaches, had tightness across the lower ribs causing difficulty breathing, and spent most of her time in bed. In April, Dr. Kecman noticed that prolonged sitting caused her severe discomfort and that it appeared to him that Ms. Hughes was frustrated due to her condition. He also noted that she reported periods of complete incapacitation of three to four days at a time. Dr. Kecman commented that Ms. Hughes' treatment had been conservative with minimal improvement, and he felt that work-related functions would exacerbate Ms. Hughes' condition due to the location and nature of the fracture.

On May 21, 2003, Ms. Hughes went to the emergency room with complaints of left-sided lower chest pain, which initially started two weeks earlier while leaning over a fence. She reported pain with deep breaths or movement of her left arm but denied any shortness of breath. The

emergency room ordered a chest x-ray, which did not demonstrate any obvious fractures.  Attending physicians prescribed pain medication and instructed Ms. Hughes to follow up with her physician.

The following month, June 2003, bone scan nuclear studies showed increased activity in the anterior end of the right fourth and left sixth ribs, consistent with prior trauma and fracture.

In November and December 2003, a physician at Demotte Physicians, Inc. found depression, osteoporosis, and insomnia.

On December 17, 2003, Narayan S. Tata, M.D., examined Ms. Hughes.  Ms. Hughes reported constant pain to the thoracic and lumbar spine region, predominantly focused in the thoracic spine.  She also described occasional sharp pains with various movements, especially with lumbar twisting, chest expansion, and pushing.  She also stated that her pain was worse with prolonged sitting and that she has difficulty sleeping.   She did not experience any burning, lower extremity radiation, or bowel or bladder changes. Ms. Hughes had not undergone any formal physical therapy, but she said that the pain medications took the "edge" off of her symptoms.  She also advised that she was receiving treatment for osteoporosis, as well as depression, but the antidepressants were not helping her much.  On examination, Dr. Tata noted the lumbar range of motion was diminished.  Ms. Hughes had normal strength, reflexes, and sensation.  Dr. Tata noted the bone scan nuclear study performed June 23, 2003, showed evidence consistent with prior trauma and fracture.  From the May 7, 2003 thoracic and rib series, Dr. Tata stated there was significant evidence of the old compression fracture at T7 and evidence of depression of the T5-T6.  Ms. Hughes had a weight shift toward the left when sitting.  Dr. Tata acknowledged that Ms. Hughes may have difficulty obtaining insurance coverage but recommended physical therapy.  Dr. Tata also prescribed sleep and pain medications and scheduled Ms. Hughes for a psychological evaluation with John Kubinski, Ph.D.

7

On June 14, 2004, Ms. Hughes returned to Demotte Physicians complaining of hand, wrist, and arm pain and tingling after spraying grass killer. The physician's impression was probably bilateral carpal tunnel syndrome (right hand more than the left hand), and he prescribed pain medication.

On June 22, 2004, a physician from the pain clinic administered a lower back steroid injection, which Ms. Hughes reported to Dr. Kubinski provided some benefit for reduced pain.

*2. Mental Medical Evidence*

On April 19, 2002, Ms. Hughes returned to Dr. Kingma to discuss depression. He noted that while on Prozac, she could not sleep, and while on Effexor she slept all the time. She also reported that the Vioxx did not help her back pain, and Dr. Kingma prescribed Zoloft. July 1, 2002 treatment notes reflect that Ms. Hughes was tired and did not feel like doing anything. Dr. Kingma continued her on Zoloft. On January 14, 2003, a physician at Demotte Physicians, Inc. altered Ms. Hughes' antidepressant medications.

On September 24, 2002, Roger L. Parks, Psy.D., evaluated Ms. Hughes and completed a Disability Determination Report at the request of the state agency. Ms. Hughes presented with a main complaint of having difficulty in coping with a "fractured spine." She also claimed that she had been diagnosed with osteoporosis and that she had pain in her upper back, neck, and occasionally in her lower back. She took Tylenol for these symptoms, which was not effective. Lying down was the most comfortable position, although she had poor sleep. She reported that she had difficulty riding in a car and sitting in one position for prolonged periods. She reported being depressed, withdrawn, and she had lost interest in things that she once liked such as reading, music,

8

and gardening.  She told Dr. Parks that she had difficulty maintaining concentration.  She took Zoloft for the past three months, but she did not believe that it had been very effective.  Ms. Hughes further reported that she was a recovering alcoholic and had relapsed several times in the past six years after maintaining sobriety for thirteen years.  Ms. Hughes did very little during the day but watch television.  She showered daily, but stayed in a robe during the day.  She seldom went out, but friends did visit her.  Her daughter did most of the household chores, but she helped care for the family dogs.  She occasionally swam for back pain therapy.

Dr. Parks described Ms. Hughes as grimacing in pain a couple of times during the examination, and she changed sitting positions frequently.  Her mood was somewhat depressed and her affect was restricted.  She conveyed feelings of hopelessness.  Her thought processes appeared rational and coherent, and her speech was fluent.  There was no evidence of recent alcohol consumption.  Ms. Hughes was oriented to day, day of the week, location, and time.  Dr. Parks diagnosed Ms. Hughes with major depressive disorder, alcohol dependence, osteoporosis, and psychosocial stressors and assessed her with a Global Assessment of Functioning ("GAF") of 50 (moderate symptoms).    The diagnosis of depression was based on her low energy level, poor concentration, lack of interest in most activities, depressed mood, social withdrawal, poor appetite, and psychomotor retardation.

R. Klion, Ph.D., reviewed the medical evidence in November 2002 at the request of the state agency.  Dr. Klion opined that Ms. Hughes' alleged mental impairments were not severe as defined by the Agency's regulations.  A second reviewing psychologist, K. Neville, Ph.D., reviewed the medical evidence in April 2003 and agreed with Dr. Klion's assessments.

9

On May 17, 2004, Dr. Kubinski completed a psychology evaluation of Ms. Hughes at Dr. Tata's request.  Ms. Hughes repeated her history and physical symptoms during her initial session. In discussing her depression, Ms. Hughes reported family situation stressors and indicated that on a daily basis she had limited activities.  Dr. Kubinski noted that Ms. Hughes' mood was significantly depressed, she had almost no energy and very little interest in anything, and she remained in the home much of the time, finding it difficult to get dressed many days.  Dr. Kubinski opined that Ms. Hughes tended to attribute these factors to her pain problem, but he believed that they were more a consequence of the depression.  He further stated that Ms. Hughes had a host of psychosocial factors that complicated treatment of the pain condition and stated that the depression seemed to be the predominant factor interfering with her appropriate function.  He diagnosed Ms. Hughes with major depression (mild), chronic pain with psychological factors and medical condition, and personality disorder not otherwise specified.  He recommended continued sessions to set realistic functional goals for Ms. Hughes.

Dr. Kubinski saw Ms. Hughes five times from May through July 2004.  During therapy sessions, Ms. Hughes reported physical symptoms as well as family stressors (e.g., difficult relationship with husband, concern over daughter's current relationship).  The psychologist presented cognitive behavior models and relaxation techniques were introduced for Ms. Hughes to utilize.  Dr. Kubinski also encouraged Ms. Hughes to increase her activity, which Ms. Hughes later admitted helped her mental state.  In June 2004, Ms. Hughes came to the sessions wearing splints on both wrists, reporting that her physician referred further diagnostic work for carpal tunnel syndrome.

## C.  Reviewing Physician Opinion

On November 7, 2002, A. Dobson, M.D., reviewed the medical evidence at the request of the state agency and prepared a Residual Functional Capacity Assessment.   Dr. Dobson acknowledged Ms. Hughes' alleged back condition and Dr. Shah's consultation report and concluded that Ms. Hughes retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and she had unlimited ability to push and/or pull.   The reviewing physician also opined that Ms. Hughes was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  He noted that Ms. Hughes was credible to the degree that functioning was restricted as recorded in the residual functional capacity assessment.

In April 2003, a second state agency reviewing physician, A. Lopez, M.D., reviewed the medical evidence and agreed with Dr. Dobson's assessment.

## D.  Testimony of the Plaintiff

At the hearing on July 13, 2004, Ms. Hughes testified that she previously worked in the field storage and verification industry doing clerical work and operating a forklift.  She explained that she could no longer sit for an extended period of time in front of a computer nor run back and forth outside to operate the forklift because it aggravated the pain.

Ms. Hughes stated that she only drove a car when she had to, which was generally for doctor appointments and when no one else can drive her.  She lived with her ex-husband and daughter.  Her daughter did most of the housework.  Ms. Hughes would occasionally cook something simple.  Her ex-husband did the grocery shopping.  Ms. Hughes would exercise in their backyard pool to increase

11

her mobility, as directed by Dr. Tata.  She would walk around in the pool for about fifteen to thirty minutes, but if she used her arms too much, they would go numb.

Ms. Hughes testified that she wore wrist splints every day at her physician's recommendation due to carpal tunnel syndrome.  She explained to the ALJ that she wore the little bar of the brace on the opposite side of her wrist because it restricted her circulation less.  She purchased the splints at the drug store, and she had not shown the splints to her doctor.  Ms. Hughes' attorney stated that she was scheduled for electromyography to explore the carpal tunnel syndrome but that money was a problem.  She stated that she took Vioxx for the carpal tunnel syndrome but that it increased her headaches.  However, she no longer has migraine headaches as she used to.

She described her back pain as feeling like she constantly had an ice pick in the middle of her back.  She explained that when she turned in a certain direction, the pain is stinging, and that the pain is aggravated more by sitting and standing than anything else.  Ms. Hughes testified that an epidural injection somewhat helped her back symptoms by alleviating the sharp pain with movement but that the injection did not help the constant feeling of having an ice pick in her back.  She also explained that she is guarded with her movements because she has to be careful not to fracture any more vertebrae.  She testified a doctor warned her that once she had one fracture, she was more likely to have others.

Ms. Hughes testified that she did not feel she could return to her clerical and forklift jobs because the forklift's vibration and the sitting for hours in front of a computer aggravated her back symptoms.

### E.  Testimony of Vocational Expert

Dr. Robert Barkhaus testified at the hearing as a vocational expert ("VE").  In response to the ALJ's hypothetical of an individual with Ms. Hughes' age, education, and prior relevant work experience, with an RFC for light work with occasional postural movements, who could not perform work that imposed a closely regimented pace production, and who is restricted from close critical supervision as it would produce unacceptable stress or distress on the individual, the VE testified that such an individual could perform Ms. Hughes' past work as a receptionist and billing payroll clerk, and could perform her telephone sales and general clerical work.  Such an individual could not perform Ms. Hughes' past work as a forklift driver and could not perform the inventory clerk position as described in the *Dictionary of Occupational Titles* but could perform the inventory clerk position as she performed it.

In response to Ms. Hughes' attorney, the VE testified that if an individual could not sit for more than four hours a day and she had to stand and walk around the rest of the time, then the individual could not do the work.  He also testified that if an individual's concentration was affected by pain so that she could not focus on tasks for more than 30 minutes at a time, then she could not do any kind of competitive employment.  Further, assuming that the person could only work for thirty minutes at a time and then required a fifteen minute break, she could not engage in competitive employment of any kind.  If the employee would have to get up at different times during the day, maybe after thirty minutes or after an hour, then the VE stated this type of occasional standing would not be a problem.  However, if she had to walk around twenty percent of the time, she could not do those jobs.

13

## F.  The ALJ's Decision

The ALJ followed the five-step sequential analysis and first determined that Ms. Hughes had not engaged in substantial gainful activity.  The ALJ also found at steps two and three that Ms. Hughes had severe impairments, but these impairments did not meet or equal a listed impairment. The ALJ determined Ms. Hughes' RFC and concluded at step four that, based, on the vocational expert testimony, Ms. Hughes was not disabled because she could return to her past relevant work. Because the ALJ found Ms. Hughes not disabled at step four, he was not required to continue through to step five.  *See* 20 C.F.R. § 404.1520.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial

14

review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard.  *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).  If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings."  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. § 404.1520(a)(4).  The Seventh Circuit has summarized the sequence as follows:

(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is capable of performing work in

15

the national economy.  Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations."  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits."  *Zurawski*, 245 F.3d at 888.  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**ANALYSIS**

In her motion, Ms. Hughes argues that the ALJ committed legal error and that his decision was not supported by substantial evidence of record.  Specifically, she argues that the ALJ failed to comply with 20 C.F.R. § 404.1520a; the ALJ erred when he substituted his own judgment for that of physicians regarding Ms. Hughes' GAF score;[2] the ALJ disregarded significant evidence of the psychological factors of Ms. Hughes' physical pain, the severity of her back pain, and her carpal tunnel syndrome; the ALJ did not make a proper credibility finding; the ALJ improperly evaluated her ability to perform past relevant work; the ALJ did not properly develop the record; and  the ALJ failed to build a logical bridge between the evidence and his conclusions regarding her depression. In response, the Commissioner argues that the ALJ properly evaluated Ms. Hughes' mental impairments, substantial evidence supports the ALJ's RFC finding, and substantial evidence supports the ALJ's finding that Ms. Hughes could perform her past work.

**A.  Evaluation of Mental Impairments Under 20 C.F.R. § 404.1520a**

Ms. Hughes first argues that the ALJ failed to use the "special technique" required by 20 C.F.R. § 404.1520a when he evaluated her mental impairments.  Section 404.1520a requires the ALJ to first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment."  20 C.F.R. § 404.1520a(b)(1).  Once the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate

---

[2] Ms. Hughes also argues that the ALJ erred when he substituted his own judgment for that of a physician , finding that alcohol use was a contributing factor material to Ms. Hughes' disability.  However, in reply to the Commissioner's response brief, Ms. Hughes withdrew this argument.

the presence of the impairment(s) and document [such] findings in accordance with paragraph (e) of this section." *Id*.

Next, the ALJ "must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record [the] findings as set out in paragraph (e) of this section." *Id*. at § 404.1520a(b)(2).  In rating the degree of functional limitation, the ALJ must consider "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id*. at § 404.1520a(c)(1).  The ALJ rates the degree of limitation based on the extent to which the impairment interferes with the ability to function independently, appropriately, effectively, and on a sustained basis.  The ALJ rates four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id*. at § 404.1520a(c)(3).  In the first three areas, the ALJ utilizes a five-point scale: none, mild, moderate, marked, and extreme, and in the fourth area, the ALJ uses a four-point scale: none, one or two, three, four or more.  *Id*.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  *Id*.

After the ALJ rates the degree of functional limitation resulting from the impairment, the ALJ must determine the severity of the mental impairment.  *See id*. at § 404.1520a(d).  If the ALJ rates "the degree of [] limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic

work activities . . . ."  *Id*. at § 404.1520a(d)(1).  If the mental impairment is found to be severe,

further steps are required.  *See id*. at § 404.1520a(d)(2)-(3).

At the ALJ hearing level, this technique is to be documented in the decision.  *See id*. at §

404.1520a(e).  More specifically:

> At the administrative law judge hearing and Appeals Council levels, the written
> decision issued by the administrative law judge or the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique.  The
> decision must show the significant history, including examination and laboratory
> findings, and the functional limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s).  The decision must include a specific
> finding as to the degree of limitation in each of the functional areas described in
> paragraph (c) of this section.

*Id*. at § 404.1520a(e)(2).

In his decision, the ALJ first generally found that Ms. Hughes has a "severe impairment that

limits her capacity for work."  R. at 21.  He next found that the medical evidence indicates that Ms.

Hughes was alleging a disorder of the back, carpal tunnel syndrome, an affective disorder, and a

substance abuse disorder.  However, he held that these impairments are "not 'severe' enough" to

meet or medically equal a listed impairment and that her impairment did not meet the "B" criteria.

He then found that the record "did not establish that she had marked limitations in her activities of

daily living; maintaining social functioning; maintaining concentration, persistence or pace; or that

she displayed episodes of deterioration, which would have caused her to withdraw from situations."

R. at 22.[3]

Ms. Hughes argues that the ALJ did not comply with the special technique because he was

required to rate each activity under the four- or five-point scale pursuant to § 404.1520a rather than

---

[3] The ALJ also found that Ms. Hughes' impairments do not meet the "C" criteria of the listing "as there is no
evidence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in
mental demands or change in the environment would be predicted to cause the claimant to decompensate.

simply stating that she did not have marked limitations in each functional area. The Commissioner acknowledges that the ALJ did not specifically break down the broad areas, but that the ALJ did express the degree of limitation by stating that her impairment was not marked in all four categories.

The ALJ made clear the degree to which he believed Ms. Hughes was limited in the four functional areas, which are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. For decompensation, he found that she had no episodes. For the first three categories, he listed each category and essentially found that her limitations did not meet the threshold of "marked," the fourth degree of limitation, which means that she could have a rating of none, mild, or moderate in each of those three categories. Although the ALJ did not precisely comply with the regulations by giving a specific rating to each of the first three categories, he nevertheless indicated that she did not have limitations of a level significant enough to meet the B criteria. Moreover, the ALJ later stated, in his assessment of Ms. Hughes' mental RFC, that she was mildly to moderately impaired. R. at 23, 26.

Ms. Hughes also argues that the ALJ's failure to specifically rate each area of impairment prevents the Court from determining if the ALJ's mental RFC assessment is supported in the record. For example, Ms. Hughes argues that, if the ALJ had found Ms. Hughes moderately impaired in concentration, he would have had to make specific findings as to how this rating translated into work-related limitations. Or, if he had found Ms. Hughes moderately limited in social functioning, she argues that he would have had to explain what limitations she had in dealing with people. A review of his decision demonstrates that the ALJ did incorporate these limitations into his findings. In his hypothetical to the VE, the ALJ described a person "who cannot perform work that opposes a closely regimented pace production." R. at 252. In addition, the ALJ held in his RFC

determination that Ms. Hughes is not able to perform work that imposes a closely regimented pace of production and that "close and critical supervision" of Ms. Hughes would produce unacceptable stress.  R. at 23.

Because the ALJ did indicate the level of limitation for the first three functional areas, found no episodes for the fourth area, incorporated the relevant functional limitations in his hypothetical to the ALJ, the Court finds that his failure to articulate the level with more specificity did not constitute a reversible legal error in this case.  In future cases, however, more careful adherence to the mandates of 20 C.F.R. § 404.1520a(c)(3) is advised.


**B.  GAF Score**

Dr. Parks performed a mental status examination and assessed Ms. Hughes as having a Global Assessment of Functioning ("GAF") Score of 50.  The Global Assessment of Functioning is a rating of overall psychological functioning.  A rating of 41-50 denotes: serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994). The GAF scale measures and "reports a 'clinician's assessment of the individual's overall level of functioning'" and is used to make treatment decisions.  *Sims v. Barnhart*, 309 F.3d 424, 427 (7th Cir. 2002) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)).  The GAF scale is "intended to be used to make treatment decisions, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."  *Wilkins v. Barnhart*,  No. 02-4302,

69 Fed. Appx. 775, 780 (7th Cir. 2003) (internal citations omitted) (citing *Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (holding that a GAF score may assist ALJ in formulating claimant's RFC but is not essential).

 In this case, the ALJ discredited the GAF rating of 50 assigned to Ms. Hughes by Dr. Parks. First, the ALJ recognized that Dr. Parks diagnosed Ms. Hughes as having a major depressive disorder, single episode; alcohol dependence; osteoporosis; psychosocial stressors due to a lack of employment and income.  He next acknowledged the GAF rating of 50, explained the purpose of the GAF rating in the clinical setting, and noted that, "as is patent in the use of GAF in this case, there is no ready translation of the projections used by the psychologists and others." R. at 26.  The ALJ then found that Dr. Parks' GAF rating was not internally persuasive based on the brief examination by Dr. Parks as a consultative examiner and by the positive or strong signs of her capacities identified in his report.  The ALJ notes that, although Dr. Parks documented Ms. Hughes' complaints of withdrawal, dysfunction, depression, and pain, Dr. Parks also found she was a slender woman with adequate grooming, who was only somewhat depressed.  The ALJ further noted that Dr. Parks found that Ms. Hughes was fluent and comprehensible, was attentive and cooperative, responded well to the arithmetic and logical challenges during examination, was oriented, and demonstrated effective judgment.  Because these findings did not support Dr. Parks' GAF rating, the ALJ found the rating unsupported and stated that "[i]t appears more reasonable to recognize the claimant as mildly to moderately impaired, with little more than a significant need for encouragement and instruction to elicit effective performance." R. at 26.

 In this instance, the ALJ was not impermissibly playing doctor, as argued by Ms. Hughes. Rather, he was taking into account a GAF rating in the context of his administrative decision

regarding disability.  Because a GAF rating has a specific clinical purpose, and although it may assist in a disability determination, an ALJ is not required to base his findings on that score.  In this case, the ALJ adequately articulated a factual basis for why he did not find that GAF rating persuasive, providing a logical bridge between the evidence and his finding, although he did find Dr. Parks' other clinical findings of mild to moderate limitations persuasive.

## B.  Credibility Determination

Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work.  20 C.F.R. § 404.1529(a).  However, subjective allegations of disabling symptoms alone cannot support a finding of disability.  20 C.F.R. § 404.1529(a).  The Social Security regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability:  (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.  20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

The ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;

23

(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making the credibility determination, Social Security Ruling 96-7p dictates that the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96-7p at *1. The Ruling provides that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p; *see Steele v. Barnhart*, 290 F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887.

Moreover, an ALJ is not required to give full credit to every statement of pain or to find a disability every time a claimant states that he or she is unable to work.  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence."' SSR 96-7p at *6.

"[T]he adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p.  As the Seventh Circuit has stated, "because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations

omitted).   Generally, an ALJ's credibility determination will not be overturned unless it was "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In his enumerated findings, the ALJ found that the "claimant's allegations regarding her limitations are not reliable." R. at 29.  In the body of his decision, the ALJ devoted one paragraph to credibility, concluding that her "testimony and discussions of impairments are not reliable." R. at 23.[4]  The ALJ generally cites SSR 96-7p and states that "the medical evidence does not support a finding that the claimant experiences limitations that can cause the problems at the level of severity she alleges," *id*., but does not identify which limitations or why the evidence is insufficient.  The ALJ then states that there "are inconsistencies with the objective medical evidence and other report." *Id*.  However, the only example the ALJ gives is Ms. Hughes' allegation that she has carpal tunnel syndrome and the fact that "there is no real evidence supporting any finding that she has the condition or what limitations exist due to this alleged condition.  The fashion in which she wore a related *cock-up splint* implies that despite her willingness to complain, she has not received careful medical attention to such a putative condition."  *Id*. (emphasis in original).

It appears that the ALJ discredited all of Ms. Hughes' allegations of pain, including her back pain resulting from the T7 compression fracture and her resulting limitations, based solely on his observations relating to her allegations of carpal tunnel syndrome.  In the context of her credibility, the ALJ makes no observations or specific findings regarding her back pain and the limitations she claims.  Nor does he explain why his credibility finding as to her carpal tunnel should be sufficient to discredit her as to her other limitations.  In addition, the ALJ does not consider her allegations in

---

[4] Just prior to this paragraph, the ALJ devoted a paragraph to the standard for credibility, noting that "[r]eliability is achieved when consistency and verification are available and when a confirmation is established for the extent of the limitations the claimant describes based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p." R. at 22.

light of the objective evidence of her back injury or the findings of the various medical examiners, including the medical evidence that supports Ms. Hughes' complaints.  Although great deference is given to an ALJ's credibility finding, in part because of the ALJ's personal observations of the claimant, the ALJ did not articulate any basis for his credibility finding regarding her back pain and mental status based on his observations; his reported observations were limited solely to her improper use of the carpal tunnel splints.

Other than the comments about carpal tunnel, which is not Ms. Hughes' major complaint of disability, the ALJ has not provided any analysis of his credibility determination or articulated specific reasons for his determination regarding her back pain and depression, other than essentially a "single, conclusory statement that . . . the allegations are [not] credible," which is insufficient. *Zurawski*, 245 F.3d at 887.

Ms. Hughes also argues that the ALJ failed to take into account the psychological aspects of her pain, which prevented him from making an accurate RFC determination.  Regarding the psychological aspects of her pain, Dr. Kubinski reported on May 17, 2004, that Ms. Hughes was depressed, that she focused on her pain problem as the primary source of her difficulty, but that numerous psychosocial factors likely are the most significant contributors to her pain problem.  Dr. Kubinski explained that Ms. Hughes' initial tendency is to attribute her difficulties getting up and getting dressed to her pain problem, but that "it clearly is much more a consequence of the depression." R. at 208.  Dr. Kubinski concluded that Ms. Hughes has a "host of psychosocial factors that are complicating treatment of the pain condition and, in fact, the depression now seems to be the predominant factor interfering with her appropriate function." R. at 209.  Dr. Kubinski, an

26

examining physician, diagnosed Ms. Hughes with major depression (mild), chronic pain with psychological factors and medical condition, and personality disorder.

In his decision, the ALJ recognized that within the class of opinions from acceptable medical sources that reflect judgments about the nature and severity of impairments and resulting limitations, treating physicians and then examining physicians are the most persuasive.  *See* 20 C.F.R. § 416.927; SR 96-2p, 96-6p, 96-7p.  The ALJ reported Dr. Kubinski's findings, recognizing that they were based on a series of Psychological Evaluations Ms. Hughes underwent from May 17, 2004 through July 6, 2004.  He noted all of Dr. Kubinski's findings as set forth in the preceding paragraph.  In addition, the ALJ referred to Dr. Kubinski's findings in subsequent visits.

After accurately summarizing this evidence, the ALJ found:

> The file does not contain evidence to support the claimant's allegation that she experiences limitations of manual functioning.  Nor has the claimant demonstrated that she has vocationally significant migraine headaches.  Exertional and postural limitations are well-supported in the claimant's documented back condition and non-exertional limitations find support in the psychological evaluations she has received.

> Findings of fact by State Agency medical consultants (Exhibits 6F) regarding the nature and severity of the claimant's impairments, and who determined that she could perform light exertional level work, expert evidence under SSR96-6p, support the findings in this decision and are consistent with the balance of the record.

> Pursuant to Social Security Ruling 96-2p I acknowledge the limitations observed by Dr. Shah (Exhibit 4F at 2) who noted the claimant's difficulty hopping and her reaching postural extremes.  His opinion is consistent with Dr. Tata [sic] opinion that the etiology of the claimant's complaints of mid thoracic and low back pain are most likely secondary to biomechanical dysfunction, as well as secondary to myofacial pain syndrome (Exhibit 12F at 16).

R. at 27.  The ALJ went on to describe the RFC, which he found to be for light work, which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing

up to ten pounds and which may require a good deal of walking or standing or sitting most of the time with some pushing or pulling of arm or leg controls.

However, these conclusions are necessarily based, in part, on the ALJ's negative credibility finding regarding Ms. Hughes' complaints of back pain, which she states imposes limitations. Dr. Kubinski has found that a significant portion of her incapacity, which she perceives to be a result of her pain, is in fact a result of her depression, which complicates the treatment of her pain. This finding of Dr. Kubinski supports Ms. Hughes' claims that she experiences limitations, contrary to the ALJ's decision. The fact that her pain and resulting limitations stem from her mental disability does not minimize the impact of those limitations. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). Whether those limitations are significant enough to prevent her from performing the specific duties of her past work or other jobs in the economy is unknown and must be reconsidered by the ALJ on remand.

Finally, the ALJ's conclusory finding that Ms. Hughes "is able to maintain her activities of daily living" is insufficient as well. R at 22. He based this conclusion on his observations that she "admitted that she cares for her dogs and exercises in a swimming pool. She also is able to care for herself and perform her own hygiene care. She prepares light meals." R. at 22-23. However, the ALJ also noted that she reported that she cannot perform tasks involving household chores including vacuuming or lifting of any laundry baskets and that her daughter does most of the cooking, vacuuming, and laundry. He acknowledged her report that she generally does very little during the day other than watch television, that she is generally in a "funk," and that she showers daily but stays in her robe. R. at 25. He further noted that she seldom goes out but friends visit her. There is a difference between a person's ability to engage in sporadic physical activities and to work eight

28

hours a day five consecutive days of the week, and the ALJ did not recognize this distinction. *Carradine*, 360 F.3d at 755 (citing *Clifford*, 227 F.3d at 872; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.2001); *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989)); *Zurawski*, 245 F.3d at 887 ("While the ALJ did list [the Plaintiff's] daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain.").  The minimal daily activities listed by the ALJ, without more, cannot support a negative credibility determination as to Ms. Hughes' complaints of severe pain.

The Court does not conclude that Ms. Hughes is disabled and entitled to benefits.  Rather, the Court finds that the ALJ's consideration of Ms. Hughes' credibility was flawed as evidenced by the lack of any explanation for discrediting her complaints of back pain and depression other than with reference to the inconsistencies in the treatment of her carpal tunnel syndrome.  The credibility determination thus impacted the RFC and finding at step four that Ms. Hughes could return to her past work.  Accordingly, the Court remands for further clarification by the ALJ regarding his credibility determination.

### D.  Back Pain - Substantial Evidence

In her Motion, Ms. Hughes argues that the ALJ erred by disregarding significant evidence of her back pain, which led him to improperly evaluate her RFC and her ability to perform her past relevant work.  The Commissioner asserts that the ALJ's decision is supported by substantial evidence.

The record demonstrates that Ms. Hughes had a record of a compression fracture at T7 in March 2001, which was the initial onset of her back pain.  Although the medical records demonstrate that the fracture healed, they also demonstrate that Ms. Hughes continued to report significant pain as a result of that fracture that was not helped by the medications prescribed by her doctors.  Ms. Hughes reported that she could only sit for ten minutes at a time and that she could not travel for long in the car.

Dr. Kecman opined that Ms. Hughes could not sit for prolonged periods of time.[5]  Dr. Kecman reported that Ms. Hughes had episodes in which she was completely incapacitated for three to four days at a time and opined that work-related functional activities would exacerbate her condition due to the location and nature of her fracture.  In addition, Dr. Kubinski reported Ms. Hughes' complaints of pain throughout his reports, noting that she reported problems with movement with resulting guarded postures.  In October 2002, Dr. Shah also diagnosed Ms. Hughes with chronic mid back pain secondary to probable compression fracture of the T6-7 vertebra and osteoporosis, noting tenderness in the thoracic spine region.  The ALJ noted all of this evidence in his decision.

The ALJ also noted that Dr. Shah's October 2002 examination revealed that Ms. Hughes was in no acute distress, could walk without a cane, could walk on her toes, could tandem walk, could squat with the aid of a chair, could not hop, had normal grip strength, had no limitations in the

---

[5]  The Commissioner argues that the opinion of Dr. Kecman, as a chiropractor, is not an acceptable medical source under 20 C.F.R. § 404.1513.  However, 20 C.F.R. § 404.1513(d) provides that, in addition to evidence from acceptable medical sources, the ALJ will "also use evidence from other sources to show the severity of your impairments and how it affects your ability to work.  Other sources include . . . (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors . . . ."  Therefore, the ALJ appropriately relied on Dr. Kecman's findings in determining the severity of Ms. Hughes' condition.

ability for fine manipulations, had muscle strength of 5/5 in all extremities, and had forward flexion of 70 degrees, extension at 20 degrees, and bilateral flexion and bilateral rotation at 15 degrees.

When an allegation of disabling pain is not supported by the objective medical evidence in the file, the ALJ must obtain a detailed description of the claimant's daily activities by "directing specific inquiries about the pain and its effects to the claimant." *Zurawski*, 245 F.3d at 887 (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994)).   The ALJ must also investigate all other documentation of pain, including observations by treating physicians, examining physicians, and third parties.   *Id*.   Finally, if the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations.   *Id*.

All of the medical evidence set forth above was documented by the ALJ in his decision. However, it seems that, because the ALJ found that Ms. Hughes was not credible in her complaints of pain, as discussed above, this evidence of severe back pain did not impact his RFC finding.   The ALJ provided no specific analysis of how the evidence of pain led to conclusions regarding her ability to perform light work, other than relying on the non-examining State Agency medical consultants who determined that Ms. Hughes could perform light exertional level work and acknowledging at face value that Ms. Hughes' back pain was secondary to "biomechanical dysfunction, as well as secondary to myofascial pain syndrome."  R. at 27.

The Commissioner argues that the ALJ's decision is supported by substantial evidence because Dr. Kecman's opinions were not adequately supported by the appropriate clinical findings that Ms. Hughes had demonstrated normal strength, reflexes, and sensation in all extremities and that there were no signs of muscle atrophy.  However, the ALJ did not opine that he gave less weight to Dr. Kecman's opinion because of the clinical findings.  More importantly, there is no evidence

of record that these specific clinical findings would preclude the debilitating pain alleged by Ms. Hughes as a result of the compression fracture of the thoracic spine. The Commissioner also argues that the opinions were inconsistent with the state agency physician reports, as found by the ALJ. However, it is not enough for the ALJ to reject the opinion of an examining physician solely based on the opinion of the non-examining physicians. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

As discussed above, the ALJ may have had an adequate reason for discounting Ms. Hughes' testimony and the other medical reports and for finding that the medical signs and findings do not support Ms. Hughes' allegations of pain, but he did not articulate them in his decision. Again, this lack of analysis of the medical evidence of back pain is tied into the ALJ's credibility determination.


### E.  Carpal Tunnel Syndrome - Significant Evidence

Ms. Hughes also argues that the ALJ erred in finding no medical evidence supporting Ms. Hughes' claim of carpal tunnel syndrome. The evidence of record concerning Ms. Hughes' carpal tunnel syndrome is minimal. On June 14, 2004, a physician with Demotte Physicians, Inc. found "probable bilateral carpal tunnel," right worse than left, when Ms. Hughes complained of pain and tingling in her wrist and hands after spraying grass killer. Dr. Kubinski noted that Ms. Hughes presented wearing splints on both wrists, reporting that her primary care physician is concerned about carpal tunnel and that she has been referred for further diagnostic work. In her Reconsideration Disability report, Ms. Hughes states that carpal tunnel has flared up in her left wrist, that she should not lift more than five pounds, and that using her hands too long "activates the carpal tunnel pain." R. at 97.

32

In his decision, the ALJ observed that Ms. Hughes was wearing the wrist braces incorrectly and opined that this indicated that she was not receiving careful medical attention for such a condition.  Unlike in *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003), cited by Ms. Hughes, in which the ALJ erred by stating that there was "no evidence" of a problem when in fact some evidence of record existed, in this case, the ALJ has acknowledged what little evidence of record existed, found that it did not support a finding that she has carpal tunnel or what limitations exist due to the condition, and explained his finding.  There are no clinical findings or objective evidence of record relating to the carpal tunnel syndrome.  The Court finds that the ALJ adequately considered the evidence of carpal tunnel syndrome and explained his conclusion.

Ms. Hughes also argues that the ALJ failed to develop the record regarding her carpal tunnel syndrome.  A claimant has the duty to prove disability, but the ALJ has a responsibility to develop a full and fair record.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th 2000) (citing *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991)).  Ms. Hughes does not suggest what the ALJ should have done to more fully develop the record, such as order more tests or invite testimony from a medical expert.  Courts generally respect an ALJ's reasoned judgment on how much evidence to gather.  *See Luna*, 22 F.3d at 692.  "If the ALJ is able to weigh the record evidence and determine whether the claimant is disabled based on that evidence, then he is not required to obtain additional evidence." *Smith*, 231 F.3d at 443 (Ripple, J. dissenting) (citing  *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999)).  At the hearing, the ALJ did question Ms. Hughes on her use of the splints and the status of any diagnosis regarding carpal tunnel syndrome.  In this instance, the Court defers to the ALJ's decision not to order further testing or medical opinion.

### F.  Depression

Finally, Ms. Hughes argues that the ALJ failed to adequately develop the record regarding her depression.  She also argues that the ALJ failed to build a logical bridge between the medical evidence of record and his finding that Ms. Hughes was only mildly depressed.

First, a claimant has the duty to prove disability, but the ALJ has a responsibility to develop a full and fair record.  *Smith*, 231 F.3d at 437 (citing *Thompson*, 933 F.2d at 585).  Ms. Hughes argues that the ALJ did not develop a full record because he did not question Ms. Hughes about her depression and its effects on her ability to function and/or do her past work.  A review of the record demonstrates that the ALJ did not question Ms. Hughes about her depression.  However, Ms. Hughes' attorney did not question her on this topic either, limiting his questions primarily to the treatment of back pain and the functional limitations flowing from the pain.  Had Ms. Hughes felt that her depression was a major factor in her inability to work, she had a responsibility to put forth evidence of it and bring it to the ALJ's attention.  The ALJ cannot be required to develop a full and fair record on issues the claimant does not put into question.  Moreover, Ms. Hughes has not suggested what other evidence of her mental condition was not adequately considered by the ALJ. *See Cannon v. Apfel*, 213 F.3d 970, 977-78 (7th Cir. 2000) ("[Plaintiff] has failed to identify any evidence that was not obtained or how a lack of evidence prejudiced her.").

Ms. Hughes also argues that the ALJ failed to build a logical bridge between his conclusion that she was only "mildly depressed" and the medical evidence.  Ms. Hughes cites Dr. Kecman's notes that she was depressed due to pain and frustrated about her condition, Dr. Kingma's diagnosis of depression in November and December of 2003, Dr. Parks' and Dr. Kubsinki's diagnoses of major depressive disorder, Dr. Kubinski's statement that Ms. Hughes was very depressed and that

her functioning was extremely low, and Dr. Kubinksi's finding that depression was a significant factor in Ms. Hughes' condition.  However, Ms. Hughes does not recognize that both Dr. Parks and Dr. Kubinski's diagnoses of "major depression" were accompanied by a finding of "single episode" and "minor," respectively.  Again, Ms. Hughes does not articulate how the ALJ's decision has prejudiced her and what additional limitations she claims to have based on her depression that the ALJ has not already considered.

To the extent that these diagnoses of depression impact the ALJ's credibility finding regarding Ms. Hughes' limitations due to pain, as discussed above, the ALJ should consider the impact the depression had on her perceptions of pain and the resulting limitations on her ability to work.  Otherwise, the ALJ did not err in his consideration of her depression.

**CONCLUSION**

For the foregoing reasons, the Court finds that the ALJ's credibility determination contains errors of law as set forth in the body of this Order.  Accordingly, the Court **GRANTS** the Motion for Summary Judgment [DE 11].  The Court **REMANDS** this matter to the ALJ for further proceedings consistent with this Order.

SO ORDERED this 1st day of March, 2006.


s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record